[Cite as *In re C.P.*, 2012-Ohio-5453.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                          |   |                          |
|--------------------------|---|--------------------------|
|                          | : | JUDGES:                  |
| IN RE: CORY P.           | : | Patricia A. Delaney, P.J. |
|                          | : | John W. Wise, J.         |
|                          | : | Julie A. Edwards, J.     |
|                          | : |                          |
|                          | : | Case No. 2012 AP 02 0016 |
|                          | : |                          |
|                          | : |                          |
|                          | : | O P I N I O N            |

CHARACTER OF PROCEEDING:    Appeal from Tuscarawas County
                            Court of Common Pleas, Juvenile
                            Division, Case No.
                            11JD00370

JUDGMENT:                   Affirmed

DATE OF JUDGMENT ENTRY:     November 14, 2012

APPEARANCES:

For State of Ohio                       For Cory P.

RYAN STYER                              CHARLYN BOHLAND
Tuscarawas County Prosecutor            Assistant State Public Defender
Tuscarawas County Prosecutor's Office   250 East Broad Street, Suite 1400
125 East High Avenue                    Columbus, Ohio  43215
New Philadelphia, Ohio  44663

[Cite as *In re C.P.*, 2012-Ohio-5453.]

*Edwards, J.*

{¶1} Appellant, Cory P., appeals from the January 18, 2012, Judgment Entry of the Tuscarawas County Court of Common Pleas, Juvenile Division.

<u>STATEMENT OF THE FACTS AND CASE</u>

{¶2} On July 19, 2011, a complaint was filed in the Tuscarawas County Court of Common Pleas, Juvenile Division, alleging that appellant was a delinquent child by virtue of having committed four counts of theft in violation of R.C. 2913.02(A)(1), felonies of the fourth degree if committed by an adult, and one count of receiving stolen property in violation of R.C. 2913.51(A), a felony of the fourth degree if committed by an adult. At his arraignment on August 16, 2011, appellant denied the charges.

{¶3} Pursuant to a Judgment Entry filed on October 18, 2011, one count of theft was dismissed upon appellee's motion.

{¶4} On December 8, 2011, appellant filed a notice indicating that he intended to introduce at trial printouts of "Facebook" conversations between himself and "a participant in the delinquent acts child is alleged to have committed."

{¶5} Subsequently, a bench trial commenced on December 15, 2011. At trial, Clyde Swanson testified that, on June 30, 2011, his son's XR100 red and white Honda dirt bike was stolen sometime after midnight from his detached garage. The bike was titled in Swanson's name, and he testified that he had paid $1,200.00 for the bike approximately two years earlier. According to Swanson, the bike was recovered a week or two later in "beat up" condition. Transcript at 23. Swanson testified that the bike was found close to appellant's house. Swanson testified that appellant, a couple of years earlier, used to hang out with his son and stayed overnight at his house and that

appellant "wasn't right so I told my son to stay away from him." Transcript at 24.  When asked if appellant had ever been in Swanson's garage, Swanson testified that he "imagine[d]" that he had been and that appellant knew about the bike. Transcript at 25. On cross-examination, Swanson admitted that he did not see who stole the dirt bike.

{¶6}   The next witness to testify was Michael Tomer. Tomer testified that he had a yellow Suzuki JR80 dirt bike that he purchased in 1998 or 1999 for $600.00. He testified that when he came home from vacation in July of 2011, the bike was gone from his detached garage.   The back plexiglass window had been pushed out of the garage and his tool box, which had been in front of the window, had been moved out of the way.   The following testimony was adduced after Tomer was asked to explain how the bike was recovered:

{¶7}   "A. Um, I'd seen [appellant] and [J.C]…

{¶8}   "Q. Now when you say [appellant], who do you mean?

{¶9}   "A. [Appellant].

{¶10}  "Q. Okay, and [J.C], you mean [J.C]?

{¶11}  "A. Yes.

{¶12}  "Q. Okay.

{¶13}  "A. I'd seen them walking up by the school and…

{¶14}  "Q. By Bolivar Elementary School?

{¶15}  "A. Correct, and I, uh, drove up through there and confronted them and after a couple of minutes of confrontation they, uh, [appellant] said he'd text somebody that knew where the bike was and that he could show me where it was so we went out

the road and they showed me right where it was and I put it on the jeep and brought it back home.

**{¶16}** "Q. Okay, and, um, did you have any reason to believe that [appellant] knew where your bike was?

**{¶17}** "A. I didn't know if he knew but I, from all the stuff I heard going around that I, uh, knew if he didn't know that himself that he knew somebody that would know was involved so...

**{¶18}** "Q. And he appeared to text someone?

**{¶19}** "A. Yes, he was texting quite a bit when I was talking to, mainly I was talking to [J.C] and [appellant] was texting.

**{¶20}** "Q. Okay, and [J.C.] was with [appellant]?

**{¶21}** "A. Correct.

**{¶22}** "Q. So if [appellant] needed to know from [J.C.] there was no reason to text him?

**{¶23}** "A. Correct.

**{¶24}** "Q. Okay. Did [appellant] tell you who it was he was texting?

**{¶25}** "A. No.

**{¶26}** "Q. Okay, no name?

**{¶27}** "A. No." Transcript at 38-39.

**{¶28}** Tomer testified that the bike, which was recovered from a ditch outside of town, had scratches from road rash and that the throttle was broken. He further testified that he did not know appellant, but had seen him walking by.

{¶29} Chief Randy Haugh of the Village of Bolivar and Zoar testified that there was a rash of thefts and burglaries during the summer of 2011, and that specific items were targeted. Chief Haugh testified that after Swanson contacted him because Swanson believed that he had seen his missing dirt bike at appellant's house, he contacted Sergeant Eric Houze of the Tuscarawas County Sheriff's Office to see if a stolen dirt bike report had been filed. When he drove by appellant's residence, Chief Haugh observed a red dirt bike in the garage. He then contacted Sergeant Houze again to relay such information. When asked, the Chief indicated that he had not seen that particular dirt bike in appellant's garage before because he had never paid attention.

{¶30} Chief Haugh testified that he conducted an investigation after Tomer reported his dirt bike stolen. He testified that he was patrolling on the evening of July 5, 2011 at around midnight near the Bolivar Intermediate School when he saw two shadows on the playground equipment at 12:30 p.m. Chief Haugh then parked his cruiser and crawled over to where appellant and J.C. were talking. He testified that he saw appellant and J.C. get into Tomer's Jeep. Chief Haugh later caught up with Deputy Ryan Hamilton, appellant and J.C. at Tomer's residence. At the time, a yellow dirt bike was strapped to the hood of Tomer's Jeep. Chief Haugh testified that he knew appellant by sight, although he did not know appellant's name, and that appellant had a lot of fresh road rash on his hands, arms, face and nose.

{¶31} Chief Haugh further testified that he took appellant home and that appellant's mother gave him permission to interview appellant. During the interview, appellant told the Chief that he did not take the items, but that he was with J.C. when the items were taken. Appellant specifically referred to the Swanson theft and said, with

respect to the Tomer theft, that he had helped J.C. get through the window. Chief Haugh testified that appellant confessed.  In a written statement provided to the Chief days later, appellant retreated from his original confession. According to Chief Haugh, appellant's written statement reduced his culpability.

{¶32} On cross-examination, Chief Haugh indicated that he did not know if a stolen dirt bike was ever recovered from appellant's garage because he turned the matter over to Sergeant Houze.  When asked if there was physical evidence linking appellant to any crime, Chief Haugh cited to appellant's wounds and the blood on Tomer's dirt bike.  However, he admitted that the blood was never tested and admitted that there was no physical evidence linking appellant to any crime. He further testified that, during the investigation, a witness came forward and indicated that he or she had seen a young male with a Mohawk riding one of the stolen dirt bikes. Chief Haugh did not know if appellant ever sported a Mohawk, but indicated that he knew that J.C. used to wear one. He further testified that he had not received statements from any witnesses who saw appellant riding a stolen dirt bike.

{¶33} On redirect, Chief Haugh testified that there was blood on the side of the tank of the Tomer yellow dirt bike when it was recovered on July 5, 2011.  Chief Haugh testified that appellant had wounds that looked like they had been bleeding while J.C. appeared to be free of injury.

{¶34} Deputy Ryan Hamilton of the Tuscarawas County Sheriff's Office testified that he assisted Chief Haugh in an investigation that began after dark on July 5, 2011. Deputy Hamilton testified that after Tomer left with appellant and J.C. in his Jeep, he went to the Tomer residence.  Deputy Hamilton testified that appellant had "many

physical injuries" on his body and that his left arm was bandaged from the elbow to the wrist. Transcript at 98. Appellant appeared to have road rash on his hand, arm and face while J.C. did not. According to Deputy Hamilton, J.C., during an interview, implicated appellant in the thefts.

{¶35} On cross-examination, Deputy Hamilton testified that there was no physical evidence linking appellant to any crime. He further admitted that J.C. was not entirely truthful during his interview and that he yelled at J.C. to stop lying. The following is an excerpt from Deputy Hamilton's testimony on redirect:

{¶36} "Q. Um, in regards to [J.C.], uh, interview. Attorney Brechbill asked you if he [J.C.] lied and you said in the beginning. Can you elaborate on that please, without telling us what he said?

{¶37} "A. Right, uh, I just remember he backtracked a couple different times in the beginning. In the end he copped to saying, yes, I took the truck,[1] this is what I did, these are things I did, which led me and Chief Haugh to believe that, towards the end he started telling the truth because he was copping to what he allegedly did.

{¶38} "Q. At the end of the interview were you confident in certain things that [J.C] had told you?

{¶39} "A. Yes.

{¶40} "Q. Okay, now in the end [J.C.] provided you confessions?

{¶41} "A. Correct.

{¶42} "Q. Okay, and in the grand scheme of things these were not, it was not difficult to get those confessions?

{¶43} "A. No.

---

[1] The charge of theft of a motor vehicle was later dismissed by the trial court.

**{¶44}** "Q. Okay. Did [appellant] ever offer to be interviewed by you?

**{¶45}** "A. No.

**{¶46}** "Q. Okay, did he ever offer to cooperate?

**{¶47}** "A. No." Transcript at 106-107.

**{¶48}** Sergeant Eric Houze testified that he took the report of Swanson's stolen bike and that the red bike at appellant's home was not Swanson's bike. According to the Sergeant, Swanson's bike was eventually recovered at another location.

**{¶49}** At trial, J.C. admitted that he recently had been convicted of three counts of breaking and entering and three counts of theft and had been sentenced. He testified that he was not testifying as part of any plea bargain and had nothing to gain by testifying.

**{¶50}** J.C. testified that they both stole on more than one night. He testified that appellant, with respect to the Tomer dirt bike, indicated that he knew where a dirt bike was and mentioned the Tomer residence. J.C. testified that when appellant approached the Tomer residence, J.C stayed in the alley and watched appellant break into the garage at about 1:00 a.m. According to J.C., appellant pried open the plexiglass window and crawled inside the garage and took the dirt bike. He further testified that appellant then walked the bike down the road and then took off on Tomer's dirt bike while J.C. rode appellant's dirt bike, which was red. At the time, J.C. had a Mohawk. J.C. also testified that the two dirt bikes crashed into each other and that appellant had road rash on his face and hands and perhaps leg and sprained or broken fingers. Appellant, according to J.C., then ditched the Tomer bike. A few days later, Tomer confronted J.C. and appellant wanting to know where the bike was. J.C. testified that he

convinced appellant to tell Tomer where the bike was and that they both guided Tomer to the bike. When asked, J.C. admitted telling Tomer that they both had stolen his bike and testified that appellant told Tomer that Dylan Dunlap had taken the bike and that he was going to call Dunlap and find out where the bike was. J.C. testified that appellant was texting Dunlap.

{¶51} J.C. also testified that appellant indicated that he knew of a dirt bike that they could steal and said that the bike belonged to Cody Swanson, who is Clyde Swanson's' son. J.C. testified that he refused to go to Swanson's property because he knew Cody and that he waited at the city ball field while appellant went to the Swanson residence and stole the dirt bike. According to J.C., appellant then rode around on the bike for a few minutes and then got off the bike and said that they should look at a red Ford F150 pick-up truck that was visible from the field. The keys were in the truck. J.C. testified that appellant insisted that they should take the truck, but that he initially told appellant no. After appellant then got into the truck and started it, J.C. got into the truck and followed appellant as he rode Swanson's dirt bike. J.C. admitted that they had stolen the dirt bike and stolen the truck. After ditching the truck, the two both rode the dirt bike.

{¶52} On cross-examination, J.C. admitted that he had pleaded guilty to breaking and entering and stealing with respect to the Swanson dirt bike and breaking and entering and stealing with respect to the Tomer dirt bike, although he testified that "I did not taken any action, but I was with [appellant]." Transcript at 150. On redirect, J.C. also admitted that, during his interview by Deputy Hamilton, he did not start out telling the truth because he was scared and that by the end of the interview, he was telling the

truth. He further admitted having Facebook conversations with appellant about the crimes, but testified that he had deleted the messages after his mother told him to do so.

{¶53} At trial, appellant's mother testified, over objection, that she assisted appellant in preparing exhibits for trial. She testified that she printed out Facebook messages for appellant. She testified that she was with appellant at the library when he copied and pasted messages from Facebook onto a disc and that appellant did not modify or change any of the information. She further testified that appellant never confessed any crimes to Chief Haugh, but rather provided Haugh with the location of a stolen item that J.C. had told appellant about. Appellant's grandmother testified similarly as to the copying of the Facebook messages.

{¶54} Appellant testified that he cooperated in the investigation of the stolen Swanson dirt bike and that the red dirt bike in his garage was his bike. The VIN on the red bike in his garage did not match the VIN on the stolen bike. Appellant further testified that he did not know about the stolen Tomer dirt bike until confronted by Tomer at the school. Appellant admitted telling Tomer where the stolen dirt bike was located, but testified that J.C. had told him where the bike was located and had threatened to hurt him if he told. According to appellant, J.C. carried a knife. Appellant denied any involvement with the theft of the Tomer dirt bike or with the theft of the Swanson dirt bike and denied telling Chief Haugh that he was with J.C. when the thefts took place. He testified that J.C. told him where the stolen items were. Appellant also testified that he never told police that J.C. had threatened him with a knife.

{¶55} Appellant testified that he highlighted and copied Facebook messages, loaded them onto a disc drive and then copied them at the library and that he did not modify or change any of the information. Appellant testified that once he discovered that he was allowed to use the messages at trial, he turned them over to his counsel. The Facebook messages were admitted as Exhibits 4, 5 and 6.  In the messages, J.C. admitted to stealing the bikes and stated that he was going to blame appellant.

{¶56} On cross-examination, appellant testified that he did not tell the officers, who came to his house to look at his dirt bike, that J.C. had the Swanson's bike, because he did not know that J.C. had the bike at the time.  While appellant, in his written statement, had indicated that he knew that J.C. had the Swanson's dirt bike, appellant testified that his written statement to police was all false.  Appellant further denied telling Chief Haugh that he was with J.C. when J.C. stole the two bikes and testified that Haugh must have misunderstood what he said.  Appellant claimed that he told Chief Haugh that he knew where the bike was.

{¶57} On cross-examination, the State introduced State's Exhibit A, fabricated Facebook messages, without alerting appellant or his counsel that the messages were fabricated.  In the messages, appellant admitted to stealing the items.  Appellant identified Exhibit A as the Facebook messages that he had printed out and given to his counsel and appellee had appellant read the fabricated confessions that he had stolen the items. After appellant denied writing the messages, the Assistant Prosecuting Attorney admitted that she had made up the Facebook messages during her lunch break.  She indicated that she had done so to show that it was "pretty obvious that you

can manipulate Facebook pages if you don't print out the Facebook pages…" Transcript at 239.

{¶58} Pursuant to a Judgment Entry filed on January 5, 2012, the trial court found that appellant was delinquent in violation of R.C. 2913.51(A) and 2913.02(A)(1). The trial court specifically found that appellant had stolen the yellow dirt bike and "clearly had the red bike in his possession, knowing it was stolen." As memorialized in a Judgment Entry filed on January 18, 2012, the trial court committed appellant to the Department of Youth Services for a minimum of six months on each offense and a maximum not to exceed appellant's attainment of the age of twenty-one. The trial court ordered that the commitments run consecutively to each other. The trial court also ordered appellant to pay restitution in the amount of $120.98.

{¶59} Appellant now raises the following assignments of error on appeal:

{¶60} "I. THE STATE'S IMPROPER ACTIONS IN PRESENTING FALSE FACEBOOK MESSAGES AS 'STATE'S EXHIBIT A.' AND MISLEADING CORY AND HIS COUNSEL DEPRIVED CORY OF HIS RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶61} "II. THE JUVENILE COURT VIOLATED CORY'S RIGHT TO DUE PROCESS WHEN IT ADJUDICATED HIM DELINQUENT OF THEFT AND RECEIVING STOLEN PROPERTY WHEN THERE WAS NO PHYSICAL EVIDENCE LINKING CORY TO THE OFFENSE, AND THE EVIDENCE WAS CONTRADICTORY AND BASED ON THE TESTIMONY OF AN UNTRUTHFUL CO-DEFENDANT, IN

VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

**{¶62}** "III. THE JUVENILE COURT ERRED WHEN IT FAILED TO CONSIDER COMMUNITY SERVICE IN LIEU OF FINANCIAL SANCTIONS BEFORE ORDERING CORY TO PAY COURT COSTS AND FINES, IN VIOLATION OF R.C. 2152.20(D).

**{¶63}** "IV. CORY WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

I

**{¶64}** Appellant, in his first assignment of error, argues that he was deprived of a fair trial by the State's improper actions in presenting false Facebook messages as "State's Exhibit A" and misleading appellant and his counsel.

**{¶65}** As is stated above, at trial, appellant presented Facebook messages that he asserted supported his claim that J.C. was lying about appellant's involvement. The Facebook messages were admitted as appellant's Exhibits 4, 5 and 6. On cross-examination, appellee showed appellant what was marked as State's Exhibit A and asked appellant if he recognized the same and appellant indicated that they were the messages from Facebook that he had printed out and provided to his counsel. When appellant's counsel asked for clarification as to what exhibit appellee was referring to, appellee was evasive. Subsequently, appellee stated that she had fabricated Exhibit A during her lunch break in order to show that Facebook pages could be manipulated. Appellant now argues that the prosecutor's actions deprived him of a fair trial.

**{¶66}** A prosecuting attorney's conduct during trial does not constitute grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402-405, 613 N.E.2d 203 (1993); *State v. Treesh* , 90 Ohio St.3d 460, 480-481, 2001-Ohio-4, 739 N.E.2d 749. The touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The effect of the prosecutor's misconduct must be considered in light of the whole trial. *State v. Durr*, 58 Ohio St.3d 86, 94, 568 N.E.2d 674 (1991); *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

**{¶67}** Evid.R. 611(B) states that cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre,* 6 Ohio St.3d 140, 145, 451 N.E.2d 802 (1983). But "[i]t is improper for an attorney, under the pretext of putting a question to a witness, to put before a jury information that is not supported by the evidence." *State v. Smidi,* 88 Ohio App.3d 177, 183, 623 N.E.2d 655 (6th Dist.1993). And "[p]rosecutors must avoid insinuations and assertions calculated to mislead." *State v. Lott,* 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990).  A cross-examiner may ask a question if the examiner has a good faith belief that a factual predicate for the question exists. *State v. Gillard*, 40 Ohio St.3d 226, 533 N.E.2d 272 (1988), paragraph two of the syllabus.  Moreover, a prosecutor may not knowingly present false testimony to procure a verdict.  *McMullen v. McMullen*, 3 Ohio St.2d 160,

165, 209 N.E.2d 449 (1965). When the State obtains a conviction by the knowing use of false evidence, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Argurs* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.E.2d 342 (1976).

**{¶68}** We find that appellee acted improperly in misleading appellant and not disclosing to appellant or his counsel that Exhibit A was a document that she had fabricated during her lunch hour in order to cross-examine appellant. Appellee clearly ambushed appellant and his counsel with the fabricated document and was not immediately forthcoming about the nature of such exhibit.

**{¶69}** However, we note that defense counsel never objected to appellee's conduct. "Absent plain error, an appellate court will not consider errors that the defendant failed to object to at the trial level." *State v. Thompson,* 127 Ohio App.3d 511, 522, 713 N.E.2d 456 (8th Dist. 1998). Crim.R. 52(B) provides that, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. In order to find plain error under Crim R. 52(B), it must be determined, but for the error, the outcome of the trial clearly would have been otherwise. *Id.* at paragraph two of the syllabus.

**{¶70}** Because the trial in this case was a bench trial, as opposed to a jury trial, and based on the evidence, as set forth in the following assignment of error, we find that appellant was not prejudiced. The trial court, as trier of fact, was aware that appellee

had fabricated the Facebook messages. We find that appellant was not prejudiced because there was not a reasonable likelihood that the judgment was affected.

{¶71} Appellant's first assignment of error is, therefore, overruled.

II

{¶72} Appellant, in his second assignment of error, argues that the finding of delinquency of theft (with respect to the yellow dirt bike) and receiving stolen property (with respect to the red dirt bike) was against the manifest weight of the evidence.

{¶73} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997–Ohio–52, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶74} Appellant specifically argues that his co-defendant, J.C., was not credible and that there was no physical evidence linking him to the crimes. Appellant notes that J.C. admitted to the offenses in this case and was sentenced, but that, at trial, he placed all of the blame on appellant. Appellant also notes that J.C. admitted that he initially lied to police about his involvement and had to be cautioned against lying.

{¶75} As is stated above, Michael Tomer testified at trial that when he confronted appellant and J.C. about the yellow dirt bike, appellant said that he would text someone who knew where the bike was and that he could show Tomer where the

bike was located. According to Tomer, appellant then took him to the bike. Tomer further testified that appellant appeared to text someone and that because J.C. was present when appellant was texting, there was no need to text J.C. if appellant needed information from J.C. as to the location of the bike. The trial court, in its Judgment Entry, found that "[n]o evidence exists to show that he [appellant] really texted anyone and the entire attempt was a poor effort to reduce [appellant's] culpability." Moreover, while appellant testified that J.C. threatened him with a knife if he told where the Tomer bike was located, appellant never told the police of such threat.

{¶76} In addition, Chief Haugh testified that appellant had a lot of road rash on his hands, arms and face and that appellant admitted being present when the yellow dirt bike was taken. Chief Haugh testified, with respect to the Tomer bike, that appellant "said he helped [J.C.] get in through the window and that appellant had confessed." Transcript at 62. There was blood on the bike and appellant was covered with road rash. According to the Chief, appellant indicated that he was part of the theft of the Swanson dirt bike. However, in his written statement, appellant changed his story and denied involvement.

{¶77} While appellant contends that J.C. was not truthful about his involvement, the record is clear that appellant was also less than truthful about his involvement. Appellant testified that his written statement to police was completely false. The trial court, as trier of fact, was in the best position to assess credibility. The trial court, in its January 5, 2012, Judgment Entry, indicated that it did not find J.C.'s character to be without question, but found that after he was already sentenced, J.C. began to tell the

truth about the incidents.  J.C. himself testified that he had nothing to gain by testifying. We find that the trial court, as trier of fact, was in the best position to assess credibility.

{¶78} Based on the foregoing, we find that the finding of delinquency was not against the manifest weight of the evidence.

{¶79} Appellant's second assignment of error is, therefore, overruled.

III

{¶80} Appellant, in his third assignment of error, argues that the trial court erred when it failed to consider community service in lieu of financial sanctions before ordering appellant to pay court costs and fines, in violation of R.C. 2152.20(D).

{¶81} Pursuant to R.C. 2152.20, if a child is adjudicated delinquent, the court may order the child to pay the costs of the action. See R.C. 2152.20(A)(2). The statute further states that prior to the imposition of costs, the "trial court *may* hold a hearing if necessary to determine whether a child is able to pay a sanction under this section." (Emphasis added). R.C. 2152.20(C). Furthermore, if a child who is adjudicated a delinquent child is indigent, the court shall consider imposing a term of community service under division (A) of section 2152.19 of the Revised Code in lieu of imposing a financial sanction. R.C. 2152.20(D).

{¶82} Appellant argues that since he is indigent, the court should have considered imposing a term of community service in lieu of costs. R.C. 2152.20(D) provides: "If a child who is adjudicated a delinquent child is indigent, the court *shall* consider imposing a term of community service * * * in lieu of imposing a financial sanction under this section." (Emphasis added.) In statutory construction, the word "shall" is generally construed as mandatory. See *Dorrian v. Scioto Conserv. Dist.,* 27

Ohio St.2d 102, 271 N.E .2d 834 (1971), paragraph one of the syllabus. The general assembly's use of the word "shall" in R.C. 2152.20(D) indicates a mandatory requirement, something the court must do. Accordingly, R.C. 2152.20(D) requires the court to consider imposing a term of community service instead of a financial sanction if the delinquent child is indigent. However, R.C. 2152.20(D) does not require the court to impose a term of community service in lieu of a financial sanction; it simply indicates that the court must consider it.

**{¶83}** In the case sub judice, the trial court was aware of appellant's indigency. The trial court had previously appointed counsel and appellant's mother had filed an affidavit of indigency on appellant's behalf. There is nothing in the record to suggest that the trial court failed to consider community control instead of a financial sanction.  See *In re Davis,* 5th Dist. No. 06CA163, 2007-Ohio-6994, ¶ 35. Furthermore, R.C. 2152.20 does not require the trial court to conduct a separate hearing to determine appellant's ability to pay nor does the statute mandate community control sanctions for an indigent juvenile. See *In re Seavolt,* 5th Dist. Nos. 2006-CA-0010, 2006-CA-0011, 2007-Ohio-2812.

**{¶84}** Appellant's third assignment of error is, therefore, overruled.

IV

**{¶85}** Appellant, in his fourth assignment of error, argues that he was denied effective assistance of trial counsel.

*{¶86}* Our standard of review for ineffective assistance claims is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ohio adopted this standard in the case of *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d

373 (1989). These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. *Id.*

{¶87} Appellant specifically contends that his trial counsel was ineffective in failing to object to the prosecutor's improper use of the fabricated Facebook messages and in failing to object to imposition of court costs and restitution without first considering community service.

{¶88} Based on our disposition of appellant's first and third assignments of error, appellant's fourth assignment of error is moot.

{¶89} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed.

By: Edwards, J.

Delaney, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

JAE/d1002

[Cite as *In re C.P.*, 2012-Ohio-5453.]

IN THE COURT OF APPEALS FOR TUSCARAWAS COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN RE: CORY P.     :
          :
          :
          :
          :
          :   JUDGMENT ENTRY
          :
          :
          :
          :   CASE NO. 2012 AP 02 0016


   For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellant.


           _____

           _____

           _____

               JUDGES